## PEOPLE *v*. RAVITZ

1. CONTEMPT—COURTS.

> To preserve the kind of trials that our system envisages, Congress has limited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice.

2. CONTEMPT—COURTS—ATTORNEY AND CLIENT—WITNESSES—CROSS-EXAMINATION.

> Contempt conviction of an attorney who sought to lead an elderly complainant into contradiction to impugn her sensory

---

REFERENCES FOR POINTS IN HEADNOTES

[1]   17 Am Jur 2d, Contempt §§ 2, 6.
 Exercise of federal court's summary power to punish for contempt committed in the actual presence of the court.   3 L Ed 2d 1855.
[2]   17 Am Jur 2d, Contempt § 25.
 Attorney's conduct as contempt of court.   14 L Ed 2d 934.

capacity as to sight and hearing, and used every device of the
advocate to discredit her identification of his client, reversed
where the trial judge did not exercise the degree of restraint
which is imposed upon all who bear the grave responsibility
of the judiciary with its attendant summary power to punish
for contempt.

Appeal from Recorder's Court of Detroit, Thomas
L. Poindexter, J.   Submitted Division 1 June 9,
1970, at Detroit.   (Docket No. 8,435.)   Decided
August 26, 1970.

Justin Ravitz was convicted of contempt of court.
Defendant appeals.  Reversed.

*Henrietta E. Rosenthal,* Judicial Assistant to the
Judges of Recorder's Court of Detroit, for the
people.

*Sheldon Otis* and *David B. Rosenthal,* for defend-
ant.

*Amici Curiae:*
Law Center for Constitutional Rights (by *William
J. Bender, Edward Carl Broege, Arthur Kinoy,
William M. Kunstler, Michael Sayer, Morton Stavis,
Nancy Stearns,* and *Peter Weiss*).
American Civil Liberties Union of Michigan (by
*Sheridan V. Holzman, Sheldon M. Meizlish, Erwin
B. Ellmann* and *Joel M. Shere* [*James K. Robinson,*
of counsel]).
Michigan Chapter of the American Trial Lawyers
Association (by *Maurice Kelman*).
National Lawyers Guild, Detroit Chapter (by
*Marc Stickgold, Charles Barr, William Goodman,
Dean Robb, Hugh Davis, Ronald Reosti,* and *Michael
Smith*).
National Lawyers Guild (by *Eric A. Seitz*).

National Emergency Civil Liberties Committee (by *Richard A. Greenberg*).

Southern Legal Action Movement (by *James E. Keenan* and *W. William Hodes*).

Before: HOLBROOK, P. J., and R. B. BURNS and O'HARA,* JJ.

O'HARA, J.     This is a case of claimed criminal contempt committed in the court's presence.     It concerns the very fine line that separates the right of the trial judge to supervise all the aspects of any proceeding before him and to enforce this supervision by statutorily prescribed punishment and the right of an attorney to pursue with vigor and thoroughness the defense of a client charged with a very serious offense.

In this case, the charge was armed robbery.     It was a vicious crime.     Two defenseless elderly ladies were beaten and robbed.     One of them, mentally retarded, was raped.

Garland Jackson was one of three men charged with the offense.     Justin Ravitz, appellant here, was his attorney.     Jackson demanded a preliminary examination.     It fell to the Honorable Thomas L. Poindexter of the Recorder's Court to conduct the examination.     The theory of counsel was very obviously that of misidentification of his client by the complaining witness.

As noted above, the complainant was elderly and apparently either hard of hearing or of limited capacity for comprehension.     We might also infer from the total record, which we have read with extreme care, that she was nervous and tired easily.

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

There is no question that counsel cross-examined her with extreme vigor. He sought to lead her into contradictions. He sought to impugn her sensory capacity as to sight and hearing. He used every device of the advocate to discredit her identification of his client. In so doing, he rephrased questions previously asked. The judge, acting as the examining magistrate, cautioned him several times to refrain from doing so and to get along with the proceedings. It must be said in fairness that the judge, on the record, questioned the attorney's motive in the prolonging of the examination. We quote:

*"The Court:* Mr. Ravitz, the court is of the opinion that you are deliberately protracting the examination knowing that you have an elderly and— woman, who is in a state of fatigue with a view of preventing this examination from coming to a conclusion. I am informing you now, and I will dispose of the matter as soon as this hearing is disposed of.

*"Mr. Ravitz:* I am perfectly willing that the court do dispose of it because I very much resent the court's charge, and I would like the record to reflect the fact—

*"The Court:* At this time the court will find you in contempt and fine you $50, Mr. Ravitz.

*"Mr. Ravitz:* Fine, very well, your Honor, might I proceed with this witness.

*"The Court:* And for your last remark the Court will fine you another $50; the amount is now $100. You are in contempt of court, Mr. Ravitz."

The examination continued with the court admonishing counsel to proceed to "matters that have not previously been asked." Finally counsel said:

"All right, your Honor, please, I do not have any more questions of the witness at this time but I would respectfully submit to the court that it is terribly difficult for any attorney to cross-examine a

witness when he is being held in contempt of court for doing that; when the court is pre-judging and saying that he is deliberately trying to arrest [?]** the witness —."

We must view the conduct of counsel in the light of testimony which he knew he would later introduce bearing upon the issue of misidentification. Again, we quote the record:

[*Questions by Mr. Ravitz*]
"*Q* State your full name, please, for the record?
"*A* George G. Matish.
"*Q* Mr. Matish, where are you employed, please?
"*A* I work for the Legal Aid & Defender's Association of Detroit.
"*Q* Do you ever have occasions to be present, sir, at lineups pursuant to court appointments under the *Wade* decision?
"*A* Yes, I do.
"*The Court:* I assume that he was at the lineup in this particular case?
"*Mr. Ravitz:* That's correct, your Honor.
"*A.* Yes.
"*Q* And, sir, do you recall being present at a lineup on or about October 2, 1969, wherein a Mrs. Knack, an elderly lady was there in an effort to identify possibly a robber of her?
"*A* Yes.
"*Q* Do you see that woman known to you as Mrs. Knack here in the court room today?
"*A* Yes, I do.
"*Q* Could you please identify her for the record?
"*A* She's the — the elderly lady in the babushka sitting in the front row, in the blue — dark blue —
"*Mr. Gibbs:* We will stipulate he has identified her.
"*The Court:* The record will show the witness has identified Anna Knack."

\*          \*          \*

---

** We suppose this is a phonetic mistake for "harass."

*[By the assistant prosecuting attorney]*

"*Q* Did you hear any conversation between any police officers on the case and Mrs. Knack?

"*A* Yes, I did.

"*Q* And in what conversation did you hear them, sir?

"*A* Well, as Mrs. Knack was standing, observing the lineup, one of the detectives—I assume he was in charge of the case—said to her that the man was in the lineup, could she identify him.

"*Q* And what was her response, sir?

"*A* She could not identify him at that time.

"*Q* She said she could not?

"*A* That's right."

We would do a disservice not to quote also from the record excerpts that are reflective of the tension between the court and the particular counsel:

"*The Court:* Just a minute witness—we have had trouble with you before, Mr. Ravitz, in this court and you complained to the University of Michigan and other places about the way I conduct examinations."

It is apparent that the judge himself considered the statement ill-advised. At the contempt hearing, he observed:

"*The Court:* The court does feel that it was unfortunate that there was a reference made by the court to the fact of the article by the University of Michigan. At that time, there were some 400 objections made to actions of the court in various courts in relation to the conduct of the riot hearings. Two of them were objections made against this court, one by Mr. Ravitz and one by another attorney. I don't know what he meant. But in view of the fact that there were 400 that would average out to about 40 objections per court; and since there were only two made to this court I suppose I should not have been concerned.

"However, it happened that those were the only two that were mentioned in the newspaper so I was inclined to be a little peevish on that day on that subject. But after examining the record I feel that that did not enter into the decision in this case. The Court of Appeals may feel otherwise."

We cannot escape the conclusion that the real contemnor here is beyond the jurisdiction of this Court and was beyond that of the court below. It is the lack of judicial manpower and facilities which the court cannot supply for itself. A judge and an attorney, each bent on the performance of his duty within the judicial system, are both subject to the pressures emanating from the demands made upon one of the busiest, if not the busiest, of the criminal courts in the country. We take judicial notice of the action of our Supreme Court in assigning judges both from and outside Detroit to help reduce the awesome backlog of criminal cases.

In this case we have been favored with most comprehensive briefs by the parties and by many more filed *amicus curiae*. We have addressed ourselves to them assiduously. We do not believe that a discussion in detail of the nuances of differentiation would benefit the trial bench or bar.

It is fair to say that the thrust of all the cases we examined recognized the delicate balance which must be maintained between appellate interference with the right of the trial judge to maintain discipline and decorum in his court, and the right of counsel to fulfill to the ultimate the obligation of advocacy. We think the principle is well summarized by the United States Supreme Court in the following language:

"While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom, or even from conduct so near to the court as actually to obstruct justice,

it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice. To preserve the kind of trials that our system envisages, Congress has limited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice, and we think that that power did not extend to this case." *In re McConnell* (1962), 370 US 230 (82 S Ct 1288, 8 L Ed 2d 434).

Our examination of the whole record here convinces us that the learned trial judge did not in this instance exercise the degree of restraint which is imposed upon all of us who bear the grave responsibility of the judiciary with its attendant summary power to punish for contempt.

The conviction is reversed.

All concurred.